# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HAROLD KENT SUTTON, | CV F  05-0968 OWW DLB HC |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| ANTHONY J. MALFI, Warden | [Doc. 1] |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1]

## BACKGROUND

Following a jury trial in the Fresno County Superior Court, Petitioner was convicted of five counts of residential burglary (Cal. Pen. Code §§ 459/460)[2] on March 1, 2002.[3] (CT 252-256, 259.)[4] On April 3, 2002, Petitioner was sentenced to an indeterminate term of 125 years to life, five consecutive terms of twenty-five years to life. In addition, Petitioner was sentenced to two five-year terms for the section 667 enhancements[5] and two one-year terms for the section

---

[1] Respondent requests that Anthony J. Malfi, Acting Warden, be substituted for Scott Kernan, as the named Respondent. Fed. R. Civ. P. 25(d).

[2] All further references are to the California Penal Code unless otherwise indicated.

[3] Although Petitioner was initially charged with six counts of residential burglary, one count was later dismissed. (*See* Exhibit 5, to Court Doc. 12.)

[4] "CT" refers to the Clerk's Transcript on Appeal; "RT" refers to the Reporter's Transcript on Appeal.

[5] The information had alleged Petitioner suffered five previous serious felony convictions (§§ 667(a)(1) & 667(b)-(I)) and had served two prior prison terms (§ 667.5(b)).

1

67.5(b) enhancements for a total determinate term of twelve years. (RT 1105-1108.)

Petitioner filed a timely notice of appeal with the California Court of Appeal, Fifth Appellate District. On January 22, 2004, the Fifth District Court of Appeal upheld the judgment in its entirety. (*See* Exhibit 5, to Court Doc. 12.)

On March 2, 2004, Petitioner filed a petition for review with the California Supreme Court. The petition was denied on April 14, 2004. (*See* Exhibit 6, to Court Doc. 12.)

Petitioner filed the instant federal petition for writ of habeas corpus on July 28, 2005. Respondent filed an answer to the petition on October 13, 2006, and Petitioner filed a traverse on December 11, 2006.[6] (Court Docs. 20, 25.)

STATEMENT OF FACTS

Prosecution's Case

Count One

Christina Evangelista was a student at California State University, Fresno and lived alone at 4592 E. Sierra Madre, Apartment E, in Fresno, on July 25, 2000. (RT 409.) On the morning of July 25, 2000, when she left for work her bedroom window was open about half an inch, and she left a front room window slightly open. (RT 410.)

When she arrived home from work, at approximately 2:30 p.m., she noticed the curtains in the bedroom that had been closed were open. (RT 411-412.) She then noticed that the bedroom window was open, the screen was missing, and she noticed fingerprints on the dusty window sill along with footprints in the dust on the floor. In addition, a lounge chair had been pushed against the wall. (RT 412.) She checked the apartment to make sure no one was there and then called the police. (RT 412-413.) An officer came and took fingerprints from around the window. (RT 413; 525-528.) She subsequently discovered that her wallet was missing, along with her alarm clock, portable stereo, musical keyboard, a roll of quarters, portable CD player, a green duffle bag, her high school ring, and all of her CDs, which she never got back. (RT 413-

---

[6] Prior to filing an answer, Respondent filed a motion to dismiss the petition as time barred on January 12, 2006. Petitioner filed an opposition on May 15, 2006. On June 12, 2006, the undersigned issued Findings and Recommendation to deny the motion, which was adopted in full on July 31, 2006. (Court Docs. 16, 17.)

2

414.)

Approximately a week after the burglary, a man knocked on her apartment door claiming he was looking for someone. She told him the person did not live there and he left. (RT 416.) The same individual did the same thing about a week later. This time he asked if someone by the name of "Frank" live there, which Ms. Evangelista said no and he left. (RT 417.) On both occasions, Ms. Evangelista did not open the door and only looked through the peephole. (RT 417.) After the second incident, Ms. Evangelista thought this was the individual who had burglarized her apartment. She then called the police, but by the time they came, the man had left. (RT 418.) Ms. Evangelista told a defense investigator that she thought Petitioner was the individual who had knocked on her door twice but she "couldn't say for sure whether it was him or not." (RT 416.)

Police Supervising Identification Technician Patrice Clement who compares fingerprints as part of criminal investigations, stated that the comparative quality of the fingerprints are sorted into three categories: A, B, and C, with A being "excellent quality," B being marginal quality and C prints lacking sufficient ridge detail for comparison purposes. (RT 606.) The fingerprints samples taken from Ms. Evangelista's apartment were rated as A quality. (RT 609, 630.) The fingerprints taken from the bedroom window matched positively with Petitioner's prints taken during trial. (RT 610-611; Exhibits 29 & 32.)

Count Two

Kevin Davis, was also a student at California State University, Fresno, who was living alone at 4550 E. Sierra Madre, Apartment D, on July 25, 2000. On that morning, he left for work at approximately 7:30 a.m. (RT 426.) His bedroom window was left slightly open due to the summer heat. When he returned home at approximately 4:00 p.m., he noticed that his back door was unlocked. (RT 427.) He then noticed that the screen on the window that had been left slightly open was sliced. (RT 428.) Davis reported it to the apartment manager and the police. (RT 428-429.) He subsequently discovered two "boom" boxes missing, along with an alarm clock, a shoulder bag, and a watch. (RT 429.)

Petitioner and the apartment manager viewed a surveillance video and they observed a

man carrying what appeared to be Davis's property down the back alley. (RT 430.) Detective Dodd printed the still photos taken from the video which depicted a slender African-American man carrying a CD "boom" box with dual speakers. (RT 432-435.) Davis acknowledged on cross-examination that he was not for certain that the property carried by the individual in the video was his property. (RT 437.) Davis reported that he never got any of his property back. (RT 438.)

The police came and took fingerprints from the bedroom and outside of the apartment. (RT 429.) Officer Donna Spenhoff lifted fingerprints from the bedroom window point of entry. (RT 532-534.) The prints were rated as C quality and were insufficient for comparison. (RT 613.) She also interviewed neighbors Kevin Wiere and Helen Sheppard and retrieved the videotape from the manager. (RT 540-541.)

Neighbor Helen Sheppard stated that an African-American man knocked on her door very loudly asking for directions to an apartment. (RT 463.) She identified the individual in the video as the same individual who knocked on her door. (RT 465.) The man told Ms. Sheppard he was hunting for a friend in the apartments. When she asked for the friend's name and said she would look in the apartment address log, Petitioner stated "that would be alright, that he would come back later" and he did not provide the friend's name. (RT 470.)

Ms. Sheppard identified Petitioner, in court and on the video surveillance, as the individual who knocked on her door. (RT 464-465.) She stated she was "most certainly" confident that it was in fact him. (RT 471.)

After encountering Petitioner at her residence on July 25, 2000, Ms. Sheppard later learned that Kevin Davis's apartment had been burglarized and she spoke to police regarding the incident. (RT 463-464.)

Count Three

Amy Boggs lived alone in an apartment at 2345 Shaw Avenue, Fresno, California on August 1, 2000. (RT 387-388.) On that day, she was asleep and because of the heat she left the bathroom window open slightly. She was awakened by the clicking of the light switch at the entrance to the room and discovered a man standing in the doorway of her bedroom. (RT 388-

4

389.) She yelled an obscenity at him, as she fled after him. (RT 388-389.) By the time she got up from the bed, he was already out of her bedroom. (RT 400.) She did not get a good look at the man, although she believed he was African-American and small in stature. (RT 389-390.) She gave up the chase after he fled from a rear window. (RT 390-391.)

She then ran to her front door, which was still locked and yelled for help and neighbors began chasing the man, while she called the police. (RT 391, 401.) She discovered that her purse was missing from the living room coffee table, which contained her wallet, credit cards, a cell phone and about $7 in cash. (RT 391-392, 402.) The purse was subsequently located empty and she did not get this property back. (RT 393.)

When police arrived, the window ledge and window area were dusted for fingerprints. (RT 394.) Police officer David Scroggins determined that the point of entry was through the kitchen window. (RT 546.) Officer Scroggins stated that Ms. Boggs told him that the window had been left slightly open for ventilation and when he discovered it, it was fully open. Partial prints and a palm print were lifted from inside the window. (RT 547-548; Exhibit 30.) They were later compared with Petitioner and were a positive match. (RT 612-613.) Ms. Boggs was unable to identify Petitioner as the man who entered her apartment. (RT 398.)

Count Four

Judy Arrellano lived with her husband at 4909 N. Backer Avenue, Apartment 107, in Fresno, California, with their two small children in August of 2000. On the morning of August 2, 2000, while her husband was at work, a short African-American man knocked on her apartment door. She looked through the peephole but did not open it, believing it was a salesman. She then heard a noise in her bedroom, as if someone was trying to remove the window screen, which was open. The man knocked on the door again and this time leaned his head against the door as attempting to hear if anyone was inside. (RT 440-444.) She did not answer the door and saw him leave. (RT 444.)

The man again moved the window and she could see him attempting to remove the screen. He had one hand inside the window and the other one pulling on the screen. (RT 444-445.) She yelled at him and he fled. (RT 446.) She then called the police. She identified

Petitioner in court as the man who had attempted to remove the screen from the window. (RT 446-447.)

Police took fingerprints from the area of the window, the apparent point of entry. (RT 559.) However, the fingerprints were insufficient to make a comparison. (RT 614.)

Count Five

Brett Baize lived in a fraternity house at 5262 N. Sixth Street near the campus of Fresno State University in August of 2000. (RT 510-511.) On August 8, 2000, Baize left for work and as was his usual practice locked his door. (RT 518, 522.) Baize returned home from work during his lunch break and as he was walking through the frat house he saw the hand of an African-American male on the doorknob of his bedroom. He thought it was unusual because there were no African-American males living in the frat house. He then backed down the hallway and saw the person standing facing his bedroom door. (RT 513-514.) Baize identified Petitioner as the individual he observed at the frat house standing near his bedroom. (RT 514.)

Baize confronted Petitioner and asked him what he was doing there. He said Petitioner looked "kind of startled" and said he was looking for a friend but did not provide a name. Baize told Petitioner, "No. You didn't come here to see anyone. What are you doing here?" Petitioner then changed his story saying he needed a drink of water because it was so hot outside. Baize told Petitioner that he did not believe him and Petitioner told him to "calm down" and left out the front door. (RT 514-515.)

As Baize walked past his bedroom he noticed the door was open and he saw a black shopping bag with some of his possessions on the floor. (RT 516.) He discovered a black neon light and an alarm clock in the bag. (RT 517.) As he attempted to follow Petitioner, he called the police on his cell phone. (RT 516.) Baize observed Petitioner jump over a gate and get away. (RT 516.) Baize was subsequently shown a photographic lineup, and he identified Petitioner as the person he observed in the frat house by his bedroom door, and stated he was "absolutely positive" about the identification. (RT 519.)

Baize later discovered that his stereo was missing, and police subsequently returned his high school ring which he had not noticed was also missing. (RT 520.)

Petitioner's Arrest

Claudio Rodriguez worked as a maintenance man and gardener at the Northpark Apartments across the street from Fresno State University in August of 2000. (RT 565-566.) At this time, he was aware that there had been some recent burglaries of the apartments and there was an individual going around turning doorknobs and knocking on doors. (RT 566.) Petitioner had come to Rodriguez's apartment door the day prior to his arrest looking for a different address and Rodriguez directed him to another complex. (RT 567, 576.)

Rodriguez saw Petitioner back at the complex, carrying a bag and wearing the same clothes (RT 573), and Rodriguez became suspicious and followed him. He was "walking back and forth in a zigzag manner" going into the breeze ways of apartments and then coming back out. (RT 568-569, 573.) Rodriguez approached Petitioner who first said he wanted to get something to eat then said he wanted to make a phone call. Rodriguez told Petitioner to wait there while he called the apartment manager, when Petitioner took off running. Rodriguez chased him and pinned him to a tree, and Petitioner was finally apprehended with the aid of a co-worker while others called the police. (RT 568-569, 572, 583.) After police arrived, Petitioner was placed in the back of the patrol car. (RT 570.)

Rodriguez was not certain that Petitioner was the man he detained in August of 2000, as it had been almost two years since the incident. (RT 569.) The parties stipulated that if Jose Garcia had been called to testify, he would have testified that he and Rodriguez held Petitioner against a tree until police arrived. (RT 790.)

Police officer Daniel Law went to the Northpark Apartments on August 8, 2000, and saw Rodriguez and Garcia pinning Petitioner to the ground. (RT 586.) Officer Law found an empty ring box, a watch, an empty wallet, and a calculator within a few feet of where Petitioner was being detained, and the items were taken. (RT 587-589.) Officer Law placed Petitioner in the back seat of his patrol car.

Judy Arrellano was called to make an identification of Petitioner. (RT 590.) Ms. Arrellano was "relatively certain" that she had seen Petitioner before. (RT 591.)

Judy Arrellano testified that she told the maintenance men that Petitioner was definitely

7

the guy that was in her apartment. (RT 448-449.) She identified Petitioner as the individual to the police. (RT 456.)

Police officer Jerry Inchaurregui started his shift at 9 p.m. on August 8, 2000, and was assigned the same patrol car that officer Law had used to transport Petitioner earlier that day. (RT 598.) As was normal police procedure, prior to beginning his shift, officer Inchaurregui searched the patrol vehicle for any contraband that may have been left behind. He found a high school class ring under the back seat. (RT 599.) The ring was subsequently given to Detective Ken Dodd who later showed the ring to burglary victim Brett Baize, who confirmed it belonged to him. (RT 599-600, 647-650.) Baize also identified the ring box as identical to his ring box, however, he could not prove it belonged to him through any distinctive markings. (RT 651.)

Police Interview of Petitioner

Detective Ken Dodd investigated the series of burglaries that occurred in the area of Maple and Shaw avenues near Fresno State University in July and early August of 2000. (RT 634.) Detective Dodd interviewed Petitioner at the police headquarters with Officer Rob Beckwith present. (RT 640.)

Petitioner was read his Miranda rights and stated that he understood those rights. (RT 643.) Detective Dodd then questioned Petitioner about the burglaries and he initially denied any involvement. Dodd told him that he had a positive fingerprint, although Dodd was actually unaware if there was a match. (RT 644-645.) Dodd stated that Petitioner's eyes became red and watery and he put his hand over his face and looked toward the ceiling, as he continued to deny any involvement. (RT 645.)

Detective Dodd asked Petitioner if he had burglarized the apartment of Ms Evangelista, and gave him the address, and he stated "yes." (RT 646.) Dodd showed him the still photos taken from the surveillance camera at Kevin Davis's apartment, and asked if that was him, he stated, "I guess I'm screwed by the one case, so it's not going to matter how many I did anyway." (RT 646.) Petitioner admitted to burglarizing the apartment of Kevin Davis. (RT 647.)

Detective Dodd testified that at the time he was interviewing Petitioner he aware that there had been 11 burglaries in a single area near the university and he explained to Petitioner

that he was willing to make a deal with him. (RT 658-659.)

Dodd told Petitioner that if "he was willing to confess and give me some details on half of those 11, then I would be willing to clear those cases out without charging him for those additional counts of burglary." Dodd said he later did, in fact, "clear" five of the cases that were never charged. (RT 659.)

Petitioner subsequently admitted to burglarizing the apartments of Ms. Boggs and Mrs. Arrellano. (RT 660-662.) Detective Dodd did not discuss the burglary of Brett Baize because he was unaware of it at that time. (RT 662-663.) Petitioner claimed that he found the property in his possession at the time of arrest on the ground near the parking lot of the Village Greens Apartments. (RT 664.)

Petitioner told Detective Dodd that he was addicted to cocaine costing approximately $100 a day, although Petitioner did not seem to have been under the influence of drugs at the time of the interview or suffering from any withdrawals. (RT 676-677.) Petitioner told Dodd that he took the alarm clocks because they could be sold for "beer money." (RT 678.)

<u>Defense Case</u>

Petitioner testified in his own defense. Petitioner had four prior felony convictions. (RT 700, 774-775.) First, Petitioner denied burglarizing the apartment of Ms. Evangelista, instead he claimed that he met her two or three days earlier and was inside her apartment on July 22, 2000. (RT 700-701.) Petitioner stated that he was visiting a friend at the apartment complex when he met Ms. Evangelista as she was coming out of the laundry room. (RT 703-704.) He stated she was carrying laundry and a wood chair and he offered to help her carry it to her apartment. (RT 705.) He asked to use her restroom, and before he could leave she asked him to carry the chair into the bedroom. (RT 708.)

Petitioner stated that there conversation became intimate and the two began kissing and had sexual intercourse for 10 to 15 minutes. Petitioner stated that he stayed in the apartment until the next morning. (RT 714-715.)

On the evening of July 28, 2000, Petitioner returned to Ms. Evangelista's apartment and knocked on the door. She did not open the door, she just told him to "Go away. I don't feel

9

1  good," and he left.  (RT 719.)

2  Petitioner denied burglarizing the apartment of Kevin Davis and stated that he was not the
3  person on the surveillance videotape.  (RT 720.)  Petitioner also denied burglarizing the
4  apartment of Amy Boggs.  (RT 720.)  When he was asked to explain his fingerprints found on
5  the window sill of Ms. Boggs apartment, he stated that he met her on July 28, 2000, at a nearby
6  7-Eleven store and had a conversation with her.  (RT 722.)  He told Ms. Boggs he was attempting
7  to find the apartment of his friend "Josephine."  He then escorted Ms. Boggs to her apartment.
8  (RT 723-726.)

9  Petitioner stated that she invited him to her apartment on the next evening, July 29, 2000.
10 He knocked on the door a couple time but she did not answer.  He spoke with Ms. Boggs through
11 the open window as she was attempting to find the key to open the door.  (RT 729.)  He
12 ultimately opened the door and the two talked for approximately two and a half hours until 10
13 p.m. and he then went home.  (RT 731.)  He denied taking any property from the apartment or
14 turning on her light switch while she was asleep in the bed.  (RT 732.)

15 Petitioner denied ever knocking on the apartment door of Mrs. Arrellano, or ever seeing
16 or attempting to enter her apartment through a window.  (RT 732-733.)

17 Petitioner admitted entering the fraternity house of Brett Baize on August 8, 2000, to get
18 a drink of water.  (RT 733.)  Petitioner stated that the area was populated with a lot of Asians and
19 he did not want to ask them for water, so he entered the fraternity house.  (RT 733-734.)  He
20 stated the house was unlocked, and because it was so quiet he decided to leave.  As he was
21 attempting to do so, Brett Baize asked him what he was doing there.  (RT 735.)  Petitioner stated
22 that he left.  He denied entering any bedroom at the house or taking any property from it.  (RT
23 756.)

24 Petitioner walked to the Village Apartment complex, where he found a watch, a
25 calculator, an empty black wallet, and a ring case, just lying on the ground.  (RT 737.)  He then
26 bought a beer at the nearby 7-Eleven store and went across the street to the Northpark
27 Apartments and met a young man and engaged in a conversation with him.  (RT 740.)  He was
28 then walking through the apartment complex when he heard someone attempting to talk to him.

1   He walked back and saw two Mexican guys. (RT 741.)

2   　　　The men advised him that they wanted to talk to him to the apartment manager regarding
3   some recent burglaries. Petitioner did not want to talk to the manager and as he attempted to
4   walk away, one of the men twisted his arm. (RT 743.) The manager arrived and told Petitioner
5   that a resident had made a complaint about him. Rodriguez and the other man then "body
6   slammed" Petitioner onto the ground. Petitioner stated that he still had the watch, calculator and
7   ring box on his person. (RT 744-746.) The men held Petitioner down for approximately 15
8   minutes until the police arrived. (RT 747.)

9   　　　Petitioner denied telling Detective Doff that he had committed any burglaries. (RT 758.)
10  Petitioner denied being the individual in the still photos taken from the video surveillance. (RT
11  760-761.) Petitioner stated that Detective Dodd told him that they found his fingerprints on the
12  boom box taken from the fraternity house. (RT 762.) Petitioner stated that Dodd then offered to
13  make him a deal in dismissing half of the burglary charges. (RT 762-763.)

14  　　　Petitioner stated that he told Detective Dodd that he was facing three strikes and it would
15  be senseless to admit to five burglaries if even one burglary would send him to prison for life.
16  (RT 763-764.) Petitioner reiterated that he did not commit any of the burglaries. (RT 764.)

17  　　　Petitioner did acknowledge that he told Detective Dodd that he had a $100 a day cocaine
18  problem. (RT 765.) However, he denied that he told him he took the alarm clocks for "beer
19  money." (RT 765-766.)

20  　　　Petitioner stated that Dodd read him the police report of the burglary of Amy Bogg's
21  apartment, and he stated that he was not involved in that burglary. (RT 767.) Petitioner denied
22  the testimony to the contrary given by Detective Dodd. (RT 769.)

23  　　　Petitioner stated that he was read several police reports regarding the burglaries and he
24  denied any involvement in the incidents. (RT 769-771.)

25  　　　Petitioner testified that he did not remember a conversation with Helen Sheppard, and he
26  never saw Claudio Rodriguez before the incident. (RT 777, 779.) Petitioner denied telling Brett
27  Baize that he was looking for a friend. (RT 778.) Although Petitioner admitted he had a ring at
28  the time of his arrest, he stated that it could not have fallen out in the police car because he was

handcuffed, and it had fallen out of his hand at the time of arrest. (RT 779.) Petitioner denied ever telling Detective Dodd about the ring. (RT 782.)

Petitioner admitted that he never told Detective Dodd about his sexual relationship with Christine Evangelista or that he had been invited into Amy Bogg's apartment. (RT 780-781.)

Petitioner denied ever making the statement admitting to any single one of the burglaries, stating it would be a "ludicrous, asinine statement." (RT 783.)

## DISCUSSION

A.  Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.  Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The AEDPA altered the standard of review that a federal habeas court must apply with

respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v. Taylor, 120 S.Ct. 1495, 1518-23 (2000). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000). "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted). "Rather, that application must be objectively unreasonable." Id. (citations omitted).

While habeas corpus relief is an important instrument to assure that individuals are constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal conviction is the primary method for a petitioner to challenge that conviction. Brecht v. Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993). In addition, the state court's factual determinations must be presumed correct, and the federal court must accept all factual findings made by the state court unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380, 1388 (9th Cir. 1997).

C.   Due Process/Fifth Amendment Violation

Petitioner contends that the trial court violated his due process rights by ruling that the involuntary confession could be introduced for impeachment purposes and subsequently allowing it to be introduced in the prosecution's case in violation of the Fifth Amendment. (Petition, at 5.)

This claim was presented on direct review to both the Fifth District Court of Appeal and the California Supreme Court. Because the California Supreme Court's opinion is summary in

nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under § 2254(d)(1)).

As summarized by the Fifth District Court of Appeal:

> At trial, [Petitioner] moved to exclude his confession on *Miranda* and involuntariness grounds. (*See* Evid. Code, § 402.) He contended he did not affirmatively waive his rights after the *Miranda* admonition and that the confession became involuntary when Dodd offered leniency in exchange for the confession. The court granted the motion in part, finding the portion of the confession following defendant's confession to the first two charged burglaries was involuntary due to the promise of leniency. The court added: "I'm not making any ruling about should the defendant elect to testify in this case and testify to something other than what he said in this statement to this officer. The People may very well be entitled to impeach him with those previous statements, but that's a different issue. My ruling only applies to the case in chief."
>
> Trial proceeded. At the close of the prosecution's case, after Dodd testified about the first portion of the confession, defense counsel informed the court he wished to withdraw his objection to admission of the entire confession and that he intended to offer the confession into evidence "regardless of whether [Petitioner] testifies in this case." The court asked, "So you are waiving any issues concerning the [c]onstitutionality of that statement, that statement being obtained by the detective or issues about *Miranda* or otherwise, right?" Counsel respondent [sic] he was waiving these issues because "I fully expect that [Petitioner] would deny having committed those burglaries on the witness stand, in which case [the prosecutor] would be able to introduce those statements in any event to impeach his credibility. And so I simply believe it's to our advantage to bring it up now." After Dodd's testimony and the close of the prosecution case, defense counsel asked for time to determine with [Petitioner] whether [Petitioner] would be testifying. Counsel informed the court that "part of that decision making process was going to be dependent upon how the examination of the afternoon witnesses went, [and] I think it's pretty clear at this point [Petitioner] is going to be testifying tomorrow. I'll take a couple minutes to talk to him." The next day, [Petitioner] testified, denying all of the burglaries and denying that he confessed to any of the burglaries to Dodd.

(Exhibit 5, to Court Doc. 12, at 2-3.)

In rejecting Petitioner's claim, the Court of Appeal held:

> This argument is meritless. First, the court expressly declined to rule that the excluded portions of the confession were or were not admissible for

> impeachment. While the law is clear that involuntary confessions are not normally admissible as impeachment of a defendant *(People v. Neal* (2003) 31 Cal.4th 63, 79), the standards of appellate review are equally clear: we do not presume error *(see, e.g., Walling v. Kimball* (1941) 17 Cal.2d 364, 373), and we certainly do not presume that the trial court would have erred if it had eventually ruled on an issue it had specifically reserved for future determination.
> 
>    Second, defense counsel sought suppression of the entire confession; the court excluded only a portion of the confession, allowing the use of [Petitioner's] confession to two of the charged crimes. After obtaining this mixed result, counsel expressly waived any constitutional objection (and unless the method of interrogation is so extreme as to constitute a due process violation in itself), admission of the entire confession was not error. (*People v. Millum* (1954) 42 Cal.2d 524, 528; *see People v. Maury* (2003) 30 Cal.4th 342, 406.)

(Id. at 4.)

It is established under the Fourteenth Amendment that an involuntary confession in a state criminal case is inadmissible for any purpose, including impeachment. See Blackburn v. Alabama, 361 U.S. 199, 207 (1960); Henry v. Kernan, 197 F.3d 1021, 1028 (9th Cir. 1999). The Ninth Circuit has specifically noted, "[T]here is no such thing as an impeachment exception for compelled, coerced, or involuntary statements." Cooper v. Dupnik, 963 F.2d 1220, 1250 (9th Cir. 1992); see also Franklin v. Henry, 122 F.3d 1270 (9th Cir. 1997).

As stated the Court of Appeal, although the trial court excluded all but the confessions to the first two burglaries of Ms. Evangelista and Mr. Davis, it expressly stated that it was not making a ruling as to whether the confession could be used for impeachment purposes. The ruling was restricted to the prosecution's case in chief . (RT 346.) Notwithstanding the incorrect inference by the trial court that the confession could potentially be used for impeachment purposes, it is clear the trial court did not reach this issue because Petitioner waived it as a trial stratagem. Defense counsel was unequivocal that he intended to cross-examine Detective Dodd regarding the confession regardless of whether Petitioner testified. (*See* RT 654.) Counsel's strategy was to argue that Detective Dodd did not follow the proper procedure in conducting the investigation. (*See* RT 656.)

Defense counsel expressed his desire to cross-examine Detective Dodd about the additional confessions pursuant to Evidence Code section 356, which allows an opposing party to probe additional portions of a statement introduced, only in part, by the other side. The trial

court acknowledged that defense counsel could do so under section 356. (RT 656.) Petitioner subsequently waived any challenge to the confessions for valid tactical reasons in support of his defense, and given such waiver, the trial court did not err in allowing the prosecution to re-open its case in chief and present the statements. The issue then became one of credibility, i.e. Dodd's credibility versus Petitioner's credibility. (*See* RT 632-664, 669-773.) Based on the finding of guilt, the jury obviously rejected Petitioner's testimony regarding the factual circumstances surrounding the burglaries.

There is no dispute as to the admissibility of the confessions involving the burglaries of Ms. Evangelista and Kevin Davis. Those confessions, along with the corroborating evidence, were sufficient to convict Petitioner on counts one and two. Specifically, Petitioner's fingerprints were found inside Ms Evangelista's apartment (*see* RT 610-611), and although Petitioner testified that he was invited into her apartment and the two engaged in consensual intercourse (see RT 700-705, 708, 714-715), the jury obviously rejected such testimony.

With regard to the other three burglaries, Petitioner's fingerprints were found inside Ms. Bogg's apartment, at 2345 E. Shaw Avenue, Fresno California. (RT 612.) Mrs. Arrellano identified Petitioner as the man who tried to enter her apartment at 4909 N. Backer, Fresno California. (RT 446-447.) Brett Baize identified Petitioner in court as the man who was trying to turn his bedroom doorknob inside the fraternity house and identified as his, the ring found on Petitioner at the time of his arrest. (RT 514, 519-520.) Accordingly, in light of the independent evidence, there was sufficient evidence to demonstrate that Petitioner was guilty beyond a reasonable doubt of all five burglaries, without the involuntary confessions. It therefore cannot be said that it had a substantial and injurious effect or influence in determining the jury's verdict. See Brecht v. Abrahamson, 507 U.S. at 637.

D.   Due Process Violation - Trial Court's Ruling

Petitioner contends that his due process rights were denied when the trial court reserved ruling on the admissibility of his confession pending his "exercise of his right to testify." Specifically, Petitioner contends "once the trial court ruled that the confession was involuntary it was inadmissible" and the "legal effect of the ruling was to preclude" its use in the prosecution's

case in chief "to impeach petitioner or in rebuttal." (Petition, at 5.)

This claim is essentially a re-characterization of Petitioner's prior claim, and fails for the same reasons as the prior claim. As Respondent correctly points out, this claim was a part of Petitioner's previous argument as presented to the Court of Appeal, and that court's holding is equally applicable here.

In addition, the state court did not unreasonably apply Supreme Court precedent when it accepted defense counsel's unambiguous decision to waive suppression of the confession. (*See* Exhibit 5, to Court Doc. 12, at 3-4.) "[W]aiver is the 'intentional relinquishment or abandonment of a known right.'" United States v. Olano, 507 U.S. 725, 733 (1993), citing Johnson v. Zerbst, 304 U.S. 458, 464 (1938). "Whether a particular right is waivable; whether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake." Olano, at 733. As previously stated, defense counsel's statements are unequivocal and his right to challenge the confession is clear. The challenge to the constitutionality of the confession was validly and expressly waived in furtherance of the presentation of his valid defense. The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

E.      Ineffective Assistance of Trial Counsel

Petitioner contends that trial counsel was ineffective when he "followed the trial court's erroneous advice about the admissibility of an involuntary confession. Defense counsel indicated that the full confession would be admissible to impeach petitioner once petitioner testified in which case the prosec[]utor would be able to impeach." (Petition, at 6.)

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d). Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998.) In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's performance was deficient, requiring a showing that

counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687.  The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable. Strickland, 466 U.S. at 688.  The court must also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness. Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).  More precisely, petitioner must show that (1) his attorney's performance was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different.

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since it is necessary to prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

Tactical decisions of trial counsel are entitled to deference when counsel makes an informed decision based on strategic trial considerations and the decision appears reasonable under the circumstances. Sanders v. Ratelle, 21 F.3d at 1456.

As with Petitioner's prior claims, this claim was presented on direct review to both the Fifth District Court of Appeal and the California Supreme Court.  Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have

issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under § 2254(d)(1)).

In rejecting Petitioner's claim, the Fifth District Court of Appeal held:

> The record is somewhat inconsistent in its reflection of defense counsel's thought processes.  Counsel stated at one point that he wanted the entire confession admitted "regardless of whether [Petitioner] testifies in this case."  This statement recognizes counsel's victory in the suppression hearing was also a partial loss: under the court's ruling the jury would hear express confessions to two counts.  Counsel's decision to expose the jury to the whole confession, as a basis for arguing (as counsel did) that Dodd was willing to take investigatory shortcuts (including making up confessions) to clear his caseload, was a plausible trial tactic, given the otherwise-admissible evidence against his client.  That this trial strategy was an independent basis for permitting admission of the whole confession is reflected not only by counsel's initial statement, but also by the fact that even after Dodd testified the question of [Petitioner's] testimony had not been finally settled between counsel and [Petitioner].
> Even if we were to reject such a reading of the record, however, and assume that counsel acted entirely on the basis of his misconception concerning admissibility of the confession for impeachment purposes, such error by counsel requires reversal only if a result more favorable to the defendant was reasonably probable if counsel had not erred.  (*Strickland v. Washington* (1984) 466 U.S. 668, 694.)
> In the present case, the choices facing counsel were particularly stark.  [Petitioner] was confronted with eyewitness identification testimony, evidence his fingerprints were inside the burgled premises, and evidence he possessed stolen property at the time of his arrest.  Counsel could have accepted the trial court's ruling, in which case, added to all of the foregoing evidence, the jury would hear about [Petitioner's] confession without any basis for counsel to show Dodd's motive for falsifying the confession.  Or, using the entire confession, counsel could establish a plausible motive  - - clearing up a whole series of troubling burglaries - - for such falsification of evidence by Dodd.  When we examine counsel's first alternative, it becomes obvious that any erroneous basis for choosing the second alternative did not result in prejudice to [Petitioner].

(Exhibit 5, to Court Doc. 12, at 4-5.)

Contrary to Petitioner's contention, defense counsel did not heed to the trial court's incorrect advisement that the involuntary confession could potentially be used for impeachment purposes, despite the reasonable inference that defense counsel may have incorrectly believed so himself.  Rather, it appears from the record that defense counsel had a valid tactical reason for

subsequently waiving the challenge to the involuntary confession as part of the defense strategy to undermine the credibility of Detective Dodd by attempting to establish the improbability of Petitioner confessing to eleven burglaries, when in fact, he was aware that a confession to even one would subject him to a life sentence as a three strike inmate.  Thus, Petitioner has not, and cannot, demonstrate that defense counsel was ineffective or that he was prejudiced thereby. Moreover, even if counsel was proceeding solely on his misconception regarding the admissibility of the confession for impeachment purposes, for the same reasons stated by the Court of Appeal, Petitioner has not and cannot demonstrate any resulting prejudice. Accordingly, the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent as set forth in <u>Strickland</u>.

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The instant petition for writ of habeas corpus be DENIED; and
2. The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendations is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **September 28, 2007**           **/s/ Dennis L. Beck**
                                        UNITED STATES MAGISTRATE JUDGE